DONALD E. LANDRY & others[1] vs. ATTORNEY GENERAL & others[2]; WILLIAM BATES, intervener.

Middlesex. March 1, 1999. - April 13, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Deoxyribonucleic Acid. Evidence,* Blood sample. *Regulation. Injunction. Administrative Law,* Regulations. *Constitutional Law,* Search and seizure, Privacy. *Privacy. Search and Seizure,* Blood sample, Expectation of privacy. *Identification.*

Discussion of the provisions of the DNA database statute, St. 1997, c. 106, codified at G. L. c. 22E, §§ 1-15 [338-340], and implementing regulations [340-341].

The involuntary collection of a blood sample from a person required to give one under the provisions of the DNA database statute, G. L. c. 22E, §§ 1-15, and regulations promulgated thereunder, does not constitute an unreasonable search and seizure in violation of the Fourth Amendment to the Constitution of the United States [343-348] or under art. 14 of the Massachusetts Declaration of Rights [348-350], where the persons subject to the collection procedure had been convicted of a crime and the State had a high interest in preserving a permanent identification record of such persons, and where the intrusion of the sampling method was minimal.

Where the regulations and protocols concerning the collection of DNA samples under G. L. c. 22E, § 4 (*a*), set out procedures designed to collect samples in a medically sound and sanitary manner, there is no further requirement under that statute for the promulgation of regulations detailing how law enforcement and correction personnel should act in specific situations that may require "reasonable force" in complying with the statute, in light of 103 Code Mass. Regs. § 505.06-505.07, applicable to inmates and defining "force," such as would necessitate enjoining the present enforcement of the statute. [350-352]

Discussion of privacy issues arising under the DNA database statute. [352-354]

CIVIL ACTION commenced in the Superior Court Department on February 2, 1998.

[1] Mariam Cartagena, William Pistorino, Albert Troisi, Vincent Gallello, John Hallett, and Geoffrey Pironti.

[2] The director of the crime laboratory within the Department of State Police (director), the superintendant of the Department of State Police, the chairperson of the Parole Board, the Commissioner of Correction, and the Commissioner of Probation.

The case was heard by *Isaac Borenstein*, J.

The Supreme Judicial Court granted an application for direct appellate review and, on its own initiative, transferred a second appeal from the Appeals Court.

*Rosemary S. Gale*, Assistant Attorney General (*Pamela L. Hunt*, Assistant Attorney General, with her) for the defendants.

*Benjamin H. Keehn*, Committee for Public Counsel Services (*John Reinstein* with him) for the plaintiffs.

*Sandra F. Bloomenthal* & *Robert T. Bloomenthal*, for the intervener, were present but did not argue.

The following submitted briefs for amici curiae:

*Lori B. Andrews, Michelle Hibbert,* & *Harold J. Krent* for Institute for Science, Law and Technology, Illinois Institute of Technology.

*Tracey Maclin* & *John F. Palmer* for Massachusetts Association of Criminal Defense Lawyers.

*Toni G. Wolfman, Colin J. Zick,* & *Nancy N. Serrano* for The Council for Responsible Genetics.

*Charles J. Ogletree, Jr.,* of the District of Columbia, *Emily Hughes,* of Iowa, *Mary Prosser,* & *Amy R. Goldstein* for Criminal Justice Institute at Harvard Law School & another.

*David Wirth,* of New York, & *Josephine Ross* for Owen M. Kupperschmid Holocaust Human Rights Project of Boston College Law School & another.

*Carolyn Baker Ringel,* for Senators Cheryl A. Jacques & James P. Jajuga, & *Wendy J. Murphy*, for Jane Doe, Inc., joined in a brief.

GREANEY, J. In these consolidated appeals,[3] we are concerned with challenges made by the plaintiffs to the validity of the deoxyribonucleic acid (DNA) database statute, St. 1997, c. 106, codified for the most part at G. L. c. 22E, §§ 1-15 (Act). A judge in the Superior Court concluded that the involuntary taking of blood samples from the plaintiffs, in accordance with the directives of the Act, violates both the Fourth Amendment to the United States Constitution and art. 14 of the Declaration of Rights of the Massachusetts Constitution. Based on this conclusion, the judge granted the plaintiffs a preliminary injunction

---

[3]The appeals arise out of the same action in the Superior Court. There were different proceedings in the action which led to two separate appeals. In the first appeal (SJC-07899), we granted the defendants' application for direct appellate review. The second appeal (SJC-07916) we transferred to this court on our own motion.

which enjoined the defendants from enforcing any aspect of the Act. We consider the grounds relied on by the judge, and an additional challenge made by the plaintiffs (which was not ruled on by the judge) that the provision in § 4 (*a*) of the Act for the use of reasonable force to obtain a DNA sample when a convicted person refuses to submit to its collection must be delineated by regulation. We conclude that the preliminary injunction cannot be justified on the grounds relied on by the judge, and that it also cannot be supported on the basis that the reasonable force provision is unlawful in the absence of regulations on the matter. Accordingly, we vacate the preliminary injunction.

1. The following background is necessary to an understanding of the issues.

(a) *The Act.* All fifty States have enacted statutes creating a DNA database. By St. 1997, c. 106, the Act was adopted in Massachusetts, and codified as G. L. c. 22E, §§ 1-15. In creating the Act, the Legislature stated its purpose as follows: "It shall be the policy of the commonwealth to assist local, state and federal criminal justice and law enforcement agencies in: (1) deterring and discovering crimes and recidivistic criminal activity; (2) identifying individuals for, and excluding individuals from, criminal investigation or prosecution; and (3) searching for missing persons. Said policy shall be served by establishing facilities for comparing biological evidence recovered during criminal investigations with biological material obtained from offenders convicted of crimes in the commonwealth." St. 1997, c. 106, § 1. The Legislature went on to express its "find[ing] that the collection and analysis of DNA samples is an integral part of the investigation and prosecution of criminal offenses and that such technology is an important tool in the defense of individuals charged with criminal offenses in the commonwealth." St. 1997, c. 106, § 2.

The Act provides as follows. Any person convicted of the perpetration of any of thirty-three enumerated crimes (or an attempt or conspiracy to commit any of them) must submit a DNA sample to the State crime laboratory. G. L. c. 22E, § 3. The Act further requires submission of a DNA sample from any person currently incarcerated, on probation, or on parole as the result of a conviction or judicial determination resulting from a charge of any of the listed offenses, notwithstanding the date of such conviction or judicial determination. G. L. c. 22E, § 3. St.

1997, c. 106, § 8. If a conviction is subsequently reversed and then dismissed, relevant DNA records may be expunged by court order. G. L. c. 22E, § 15. Failure to furnish a DNA sample is punishable by a $1,000 fine or up to six months' imprisonment. G. L. c. 22E, § 11. Law enforcement officers and correction personnel are authorized to use "reasonable force" to assist in collecting the DNA samples "in cases where an individual refuses to submit to such collection as required under [the Act]." G. L. c. 22E, § 4 (*a*).

A "DNA sample" is defined by the statute as "biological evidence of any nature that is utilized to conduct DNA analysis." G. L. c. 22E, § 1. The Act provides that, once a sample is collected, through a process established by way of detailed regulations, it is forwarded to the director of the State crime laboratory within the Department of State Police (director) for analysis. G. L. c. 22E, § 6. "DNA analysis" entails undertaking "DNA typing tests" on the submitted DNA samples "that generate numerical identification information." G. L. c. 22E, § 1. The result is a "DNA record," which contains the numerical identification information derived from the samples by the analysis. G. L. c. 22E, § 1. Once a sample has been processed, the DNA record becomes a part of the State DNA database, G. L. c. 22E, § 3, and will also be forwarded to the Federal Bureau of Investigation (FBI) for storage and maintenance in CODIS, or "combined DNA index system," the "[FBI]'s national DNA identification index system which facilitates the storage and exchange of DNA records submitted by state and local criminal justice and law enforcement agencies." G. L. c. 22E, § 1. See G. L. c. 22E, § 10 (*b*).

The Act limits access to, and use of, the information obtained from DNA samples. G. L. c. 22E, §§ 6-10. DNA records are confidential, are not included in the criminal offender record information system, and may be disclosed only as authorized by the Act. G. L. c. 22E, § 9. The Act states that the director is to forward a DNA record to local police departments, to the Department of Correction, to a sheriff's department, to the parole board, or to prosecuting officers on written or electronic request. G. L. c. 22E, § 10 (*a*). It further mandates disclosure of DNA records to "local, state and federal criminal justice and law enforcement agencies, including forensic laboratories serving such agencies, for identification purposes in order to further official criminal investigations or prosecutions." G. L. c. 22E,

§ 10 (*b*) (1). The Act also requires that DNA records be furnished to the FBI for inclusion in CODIS, G. L. c. 22E, § 10 (*b*) (2); that defendants who are charged with crimes as a result of a DNA database search be provided with a copy of their own DNA record, G. L. c. 22E, § 10 (*b*) (3); and that DNA records be made available as necessary to obtain Federal funding. G. L. c. 22E, § 10 (*c*).

The Act allows the director, at his discretion, to make DNA records, after all personal identifying information is removed, available "to authorized persons or organizations," for the limited purpose of "advancing DNA analysis methods and supporting statistical interpretation of DNA analysis, including development of population databases." G. L. c. 22E, § 10 (*d*) (1). DNA records may also be supplied for identifying victims of mass disasters, identifying missing persons, and for "advancing other humanitarian purposes." G. L. c. 22E, § 10 (*d*) (2)-(4).

(b) *Implementing regulations.* In keeping with the Act's provisions, the director has promulgated two sets of emergency regulations concerning the collection, submission, receipt, identification, storage, and disposal of DNA samples, see 515 Code Mass. Regs. §§ 1.01-1.06 (1998); and the testing and analysis, quality assurance, computerized storage, retrieval, and dissemination of the DNA database, see 515 Code Mass. Regs. §§ 2.01-2.16 (1998).

(i) The first set of regulations contains provisions that identify those individuals who may collect DNA samples, details the materials and procedures that those individuals must use to collect the samples and ensure that they are not contaminated, and establishes identification and record-keeping procedures the collectors must utilize during the collection process. See 515 Code Mass. Regs. § 1.04. Eight drops of blood are collected by a qualified person following a finger prick with a lancet provided in a special testing kit. See 515 Code Mass. Regs. § 1.04(3)(g), (j), (k). In addition, the regulations set forth procedures to be used by evidence technicians (that is, the individuals authorized to accept the DNA samples at the State crime laboratory) to receive the samples and record the details necessary for proper identification. 515 Code Mass. Regs. §§ 1.03-1.05. The regulations also specify handling and storage procedures for the DNA samples and their accompanying collection and information cards. 515 Code Mass. Regs. § 1.05(2)-(3). All samples

and collected information are to be "stored indefinitely in a secure storage area." 515 Code Mass. Regs. § 1.05(4).

(ii) The second set of regulations spells out the methods to be used to analyze DNA samples, and security measures to prevent unauthorized access to, or disclosure of, information in the DNA database. See 515 Code Mass. Regs. §§ 2.04-2.11. The regulations specify that the DNA database "shall be comprised of data generated from STR testing." 515 Code Mass. Regs. § 2.04(1). STR, or short tandem repeat testing, is "[a] form of testing which provides DNA profiles for loci which contain simple DNA unit repeats."[4] 515 Code Mass. Regs. § 2.03. The regulations go on to outline procedures the director must use to authorize access to the database, and limit more strictly the reasons for which DNA samples and analyses may be disclosed.[5] See 515 Code Mass. Regs. § 2.13. These regulations also contain provisions describing the expungement procedure. See 515 Code Mass. Regs. § 2.15.

---

[4] In *Commonwealth* v. *Rosier*, 425 Mass. 807, 811-813 (1997), we discussed the STR method of analysis and validated its use in Massachusetts as scientifically acceptable evidence. The most notable feature of STR testing is that STRs found on a DNA strand are likely not to be associated with any known genetic coding function. See National Research Council, The Evaluation of Forensic DNA Evidence 117 (1996).

[5] DNA samples and DNA analyses can be disclosed only:

"(a) to criminal justice agencies for law enforcement identification purposes, which shall include (at the discretion of the Director) to assist the identification of human remains from mass disasters or to identify whether such remains are from those of a missing person, upon written or electronic request to the Director;

"(b) in judicial proceedings, if otherwise admissible pursuant to applicable statutes or rules;

"(c) for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged;

"(d) if personally identifiable information is removed, for a population statistics database, for identification research and protocol development purposes, or for quality control purposes."

515 Code Mass. Regs. § 2.13(1).

Most notably, the regulation limits the director's authority to disseminate information to local law enforcement agencies for identification.purposes, § 2.13(1)(a), and contains no provision relating to dissemination of information for "humanitarian purposes."

(c) *The plaintiffs' lawsuit*. The plaintiffs' amended verified complaint sought declaratory and injunctive relief. The plaintiffs include a parolee (Landry), two probationers (Cartagena and Troisi), a citizen (Pistorino), and three inmates (Hallett,[6] Gallello, and Pironti), all of whom are subject to the Act and either have had a sample of their DNA collected or have received notice that a sample is to be collected. The complaint alleged a host of challenges to the Act, including claims that its provisions violate several provisions of the United States and Massachusetts Constitutions. The plaintiffs' application for preliminary injunction was supported by various affidavits from experts and other individuals contesting the government's claims relating to recidivism and the accuracy of the DNA testing process, and other materials, including copies of the notices sent to the plaintiffs regarding their obligation to provide DNA samples, newspaper articles describing the new law, information about the Federal grants available for the establishment of laboratories capable of analyzing DNA, and records of the plaintiffs' attempts to obtain State regulations, which had, at the time, not been published.

The defendants opposed the application with affidavits from experts and others and materials of their own. The defendants provided copies of the DNA database blood collection kit instruction sheet, and affidavits designed to show that, in spite of the initial absence of published regulations, the director had focused efforts on the establishment of protocols and procedures for the collection of DNA samples.

After litigation that is not relevant to resolution of the appeals, the judge granted the preliminary injunction we are concerned with, principally on the basis that the collection of DNA samples under the Act from the plaintiffs violated the prohibitions in the Fourth Amendment and art. 14 against unreasonable searches and seizures.[7] It is these grounds we now turn to, concluding that the reasoning given by the judge does

[6]Hallett's conviction for unarmed robbery was reversed and a new trial ordered by this court on June 2, 1998. See *Commonwealth* v. *Hallet*, 427 Mass. 552, 559 (1998) (defendant's name spelled with one "t" as it appeared on the indictment). Under G. L. c. 22E, § 15, he must wait one year or obtain a written authorization of no further prosecution from the district attorney before moving to expunge his DNA record. Therefore, his claim is not moot.

[7]The judge also purported to support the grant of the preliminary injunction by concluding that the Act might be enforced in an arbitrary manner. He did so by taking judicial notice of another Superior Court case pending in Middle-

not justify the grant of a preliminary injunction under either constitutional provision. We consider the question under the familiar standard governing the grant of a preliminary injunction. See *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 616-617 (1980). We consider as well that the Act is to be presumed constitutional, see *Tobin's Case*, 424 Mass. 250, 252 (1997), that the case is an appropriate one to consider the risk of harm to the public interest that an injunction could pose, see *GTE Prods. Corp.* v. *Stewart*, 414 Mass. 721, 723 (1993), and that, as the judge correctly noted, the remedy of a preliminary injunction "should not be grant[ed] unless [the plaintiffs] by a clear showing, carrie[d their] burden of persuasion."

2. The Act does not violate the Fourth Amendment. There is no disagreement that the involuntary collection of a blood sample from a person designated to furnish one under the Act constitutes a "search and seizure" for purposes of the Fourth Amendment and art. 14. As has been mentioned, all fifty States have enacted DNA database statutes.[8] The appellate courts that have considered Fourth Amendment challenges to such statutes have uniformly held that the involuntary collection of a blood

sex County, in which (according to the judge) an inmate incarcerated for a non-violent crime not enumerated in the Act is being compelled to furnish a DNA sample based on the inmate's conviction in 1985 for a violent offense which is enumerated in the Act. The judge concluded that the prisoner was not subject to the Act, and he criticized "the Commonwealth [for] seek[ing] an expansive view of the statute and its execution . . . [thereby] aggravat[ing] the dangers built into [the] statute."

The plaintiffs do not on appeal press this aspect of the judge's reasoning with any vigor. The question whether the inmate in the pending Superior Court case cited by the judge can be compelled to give a DNA sample is not before us. The judge's generally unsupported view that the Commonwealth may be acting wrongfully with respect to the inmate would not provide a sufficient basis to grant a preliminary injunction negating implementation of the entire Act.

[8]We have examined a number of the DNA database statutes, and find that they are, in essence, similar to the Act. Some States collect DNA samples from a more narrowly defined group of convicted persons, for example, sex offenders. See, e.g., Colo. Rev. Stat. Ann. § 17-2-201(5)(g) (West 1998) (blood sample must be given as condition of parole). Others require samples from a broader group, such as all felons, see Va. Code Ann. § 19.2-310.2 (Michie 1998), or include juveniles tried as adults, see, e.g., Idaho Code Ann. §§ 19-5501, 19-5506 (Michie 1997); Or. Rev. Stat. Ann. § 419C.473 (Michie 1995 & Supp. 1998). Louisiana has enacted a statute that will require testing of all persons arrested for a felony sex offense or other specified offense, see La. Rev. Stat. Ann. § 15:609 (West Supp. 1999) (statute effective September,

sample under a DNA database statute from a person required to furnish one does not involve an unreasonable search and seizure. See *Boling* v. *Romer*, 101 F.3d 1336, 1340 (10th Cir. 1996); *Rise* v. *State*, 59 F.3d 1556, 1560 (9th Cir. 1995), cert. denied, 517 U.S. 1160 (1996); *Jones* v. *Murray*, 962 F.2d 302, 306 (4th Cir.), cert. denied, 506 U.S. 977 (1992); *People* v. *Wealer*, 264 Ill. App. 3d 6, 17 (1994); *State ex rel. Juvenile Dep't of Multnomah County* v. *Orozco*, 129 Or. App. 148, 153-154 (1994) (en banc); *State* v. *Olivas*, 122 Wash. 2d 73, 98 (1993) (en banc).[9] These decisions have proceeded on one of two approaches to Fourth Amendment analysis.

The first approach focuses on a State's interest in the identity of convicted persons. The analysis starts with the premise that convicted persons, unlike other citizens, have a diminished expectation of privacy in their identity. See *Jones* v. *Murray*, *supra* at 306. In *Rise* v. *State*, *supra* at 1560, the court said:

1999).

Virginia's statute was recently amended to require that a "blood, saliva or tissue" sample be taken from all persons convicted of felony offenses. See Va. Code Ann. §§ 19.2-310.2 to 19.2-310.5 (Michie 1998).

The statutes differ as to the uses to which the data may be put. For example, North Carolina states that its policy is to assist in the "identification, detection, or exclusion of individuals who are subjects of the investigation or prosecution of violent crimes against the person," and thus appears to limit dissemination of data to law enforcement officials for those crimes only. N.C. Gen. Stat. Ann. § 15A-266.1 (Michie 1997). Indiana explicitly prohibits collection or storage of DNA database records for the purpose of obtaining information about human physical traits or predisposition for disease. Ind. Code Ann. § 10-1-9-18 (West Supp. 1998). In Virginia, use of the DNA database is restricted to Federal, State, and local law enforcement officers in furtherance of an official investigation of any criminal offense, but the statute does not restrict the use of evidence for identification purposes. Va. Code Ann. § 19.2-310.5 (Michie 1998). New York allows records contained in its DNA identification database to be released to law enforcement agencies or district attorneys' offices for "law enforcement identification purposes," to assist in the recovery or identification of human remains and missing persons (provided there is an agreement relating to dissemination of the information), to a defendant in a criminal case for defense purposes, as long as the sample was obtained in connection with the case, and, after all personal identification is removed, to an entity creating or maintaining a population statistics database, or for identification research and protocol development for forensic DNA analysis or quality control purposes. N.Y. Exec. Law § 995-c(6) (West 1998).

[9]Two United States District Court decisions have also rejected Fourth Amendment challenges to prisoner DNA database statutes. See *Kruger* v. *Erickson*, 875 F. Supp. 583, 588-589 (D. Minn. 1995), aff'd, 77 F.3d 1071 (8th Cir. 1996); *Ryncarz* v. *Eikenberry*, 824 F. Supp. 1493, 1498-1499 (E.D. Wash. 1993).

"Once a person is convicted of [a serious crime], his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from the blood sampling." The courts using this analysis go on to examine the reasonableness of the search and seizure, and they have all concluded that the intrusion occasioned by a blood test is "not significant," involving little risk or pain. See *Jones* v. *Murray, supra* at 307, quoting *Skinner* v. *Railway Labor Executives' Ass'n*, 489 U.S. 602, 625 (1989). The courts point to other mandatory blood tests which have been upheld, saying that such tests "can be reasonable under the Fourth Amendment, even with respect to free persons, where the slight intrusion is outweighed by the governmental interest advanced by the intrusion." See *Jones* v. *Murray, supra*, and cases cited. See *Skinner* v. *Railway Labor Executives' Ass'n, supra* (upholding drug and alcohol tests of railroad employees for safety reasons). See also *Dunn* v. *White*, 880 F.2d 1188, 1196-1197 (10th Cir. 1989), cert. denied, 493 U.S. 1059 (1990) (upholding blood tests on prisoners to detect HIV). The courts then engage in a balancing test, weighing the government's strong interest in preserving an identification record of convicted persons for resolving past and future crimes,[10] against the minor intrusion into their diminished privacy right in their identities by the taking of a DNA sample. See *Jones* v. *Murray, supra* at 307. The courts conclude that the high government interest in a particularly reliable form of identification outweighs the minimal intrusion of a pin prick. See *id.*

The other approach that has been used to justify taking of blood from convicted persons for DNA identification analysis is that discussed in *State* v. *Olivas, supra* at 93, where the court rejected a Fourth Amendment challenge to DNA blood testing, because "special needs beyond law enforcement" existed. The court in *Olivas* justified a search and seizure for DNA under that exception to the warrant requirement of the Fourth Amendment. See *id.* at 88-89, citing *Skinner* v. *Railway Labor Executives' Ass'n, supra* at 620-621 (government has "special need"

---

[10]In support of this point, the courts often point to documented evidence of high rates of recidivism among certain types of felons and sex offenders, and the fact that homicides, sexual offenses, and other crimes are more likely to produce certain evidence from which DNA information can be derived, such as blood, semen, hair, or saliva. See *Rise* v. *State*, 59 F.3d 1556, 1561 (9th Cir. 1995).

"to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs"). Under this analysis, the establishment of a DNA databank is considered a deterrent to recidivism on the part of convicted persons, and, therefore, suspicionless blood testing is justified because it serves a special need beyond "normal" law enforcement. See *Olivas, supra* at 93.

In consideration of the Fourth Amendment, the judge rejected the defendants' arguments relating to the balancing or special needs modes of analysis. Instead, he relied on *Schmerber* v. *California,* 384 U.S. 757, 768 (1966) (involving involuntary blood test taken at hospital after automobile accident to determine whether arrested suspect was under influence of alcohol), and *Winston* v. *Lee,* 470 U.S. 753, 761 (1985) (involving attempt to compel charged suspect to undergo surgical procedure to remove bullet from his collarbone), which state that, when the search and seizure involve an involuntary blood test, probable cause is a threshold requirement.

The holdings in the *Schmerber* and *Winston* decisions, however, must be understood in the context of Fourth Amendment analysis which considers the nature of the involved person's reasonable expectation of privacy. Neither case involved a situation where the person subject to testing or a medical procedure had been convicted of a crime. Further, neither case contemplated a situation where the bodily intrusion occurred simply for the purpose of adding to a record of identity and not to search for evidence of a crime. If a convicted person has a low expectation of privacy in his identity by reason of the taking and storing of fingerprints, photographs, and other criminal records, then the privacy interests which trigger the assumption that probable cause or individual suspicion is needed to amplify a record of identification by a nonharmful procedure are eliminated. In this context, the *Schmerber* and *Winston* requirements of probable cause and a search warrant are simply inapplicable, as long as the DNA sample is taken from a convicted person for identification purposes only.

We have recognized that "[t]he maintenance of fingerprint, photograph and arrest records serves an important law enforcement function." *Commonwealth* v. *Shipps,* 399 Mass. 820, 832 (1987), quoting *Police Comm'r of Boston* v. *Municipal Court of the Dorchester Dist.,* 374 Mass. 640, 655 (1978). We have also stated that "arrest records serve 'as a means for identification

and apprehension of criminals.' " *Police Comm'r of Boston* v. *Municipal Court of the Dorchester Dist.*, supra at 655, quoting *Morrow* v. *District of Columbia*, 417 F.2d 728, 748 (D.C. Cir. 1969) (Tamm, J., dissenting in part). The State has an established and indisputable interest in preserving a permanent identification record of convicted persons for resolving past and future crimes, and uses fingerprints, and now will use DNA identification, for these purposes. The obtaining of a very small amount of blood by pin prick constitutes only a minimally intrusive search. See *Skinner, supra* at 625 (does not "infringe significant privacy interests"); *Winston, supra* at 762 (not an "unduly extensive imposition"); *Schmerber, supra* at 771 ("commonplace"). The balance of interests clearly weighs in favor of the use of DNA in accordance with the Act to create a record of identification.

We need not discuss the judge's other reasoning[11] or the "special needs" analysis. We conclude, under the first approach discussed above, that the Act does not violate the Fourth Amendment. "We do not [necessarily] rely on any supposition that [convicted persons] are more likely to be recidivists than others, nor . . . on the penological interests within the prison. We do rely upon the specific relevance of DNA evidence to prove [serious crimes]. Thus we hold that while obtaining and analyzing the DNA [under the Act] is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of [a convicted person's] diminished privacy rights . . . the minimal intrusion of . . . blood tests; and the legitimate government interest in the investigation and prosecution of unsolved and future criminal

---

[11]The judge rejected the argument that a bodily intrusion can be minimal in some circumstances, stating that the "United States Supreme Court has *never held* that a bodily intrusion can occur without at least individualized suspicion, if not probable cause, of criminal activity and a clear indication that such intrusion will provide probative evidence connecting the defendant to said activity" (emphasis in original). While this may be so, it is also true that the Supreme Court has never held that there must be particularized probable cause or suspicion to justify gathering and retaining a permanent record of a convicted person's identity. If that were so, then suspects' fingerprints and photographs would have to be discarded after their initial evidentiary and identification purposes had been served. The need for DNA information is like the need for fingerprints and photographs. This context is entirely different from the context of the cases from which the judge drew his conclusions. The bodily intrusion is minimal, and its only purpose is for identification; the blood test is not a "fishing expedition" for incriminating evidence of a crime.

acts by the use of DNA in a manner not significantly different from the use of fingerprints." (Footnote and citation omitted.) *Boling* v. *Romer, supra* at 1340.

3. Article 14 may not be construed in any principled way to conclude that, with regard to the Act, the plaintiffs possess greater rights under the State Constitution than those granted by Federal decisions interpreting the Fourth Amendment.

As is the case with the Fourth Amendment, a warrantless search and seizure violates art. 14 only if it is unreasonable. See *Commonwealth* v. *Shields,* 402 Mass. 162, 164 (1988); *Commonwealth* v. *Sheppard,* 394 Mass. 381, 391 (1985). Under art. 14, we "determin[e] reasonableness . . . by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." *Commonwealth* v. *Shields, supra,* quoting *Commonwealth* v. *Silva,* 366 Mass. 402, 405 (1974). The State must produce a particularized reason for the need for such searches and seizures, see *Guiney* v. *Police Comm'r of Boston,* 411 Mass. 328, 331-332 (1991) (*Guiney*), which outweighs the degree of invasiveness occasioned by its action. See *Commonwealth* v. *Shields, supra* at 165.

Inherent in this balancing test, which approximates the Fourth Amendment test previously discussed, is the measure of the expectation of privacy of the person subject to the search and seizure. A privacy interest is protected under art. 14, when, as is the case under the Fourth Amendment, "it is shown 'that a person [has] exhibited an actual (subjective) expectation of privacy,' and when that 'expectation [is] one that society is prepared to recognize as "reasonable." ' *Katz* v. *United States,* [389 U.S. 347, 361 (1967)] (Harlan, J., concurring)." *Commonwealth* v. *Blood,* 400 Mass. 61, 68 (1987). A statute, or other rule or regulatory provision, is unlikely to be found constitutional under art. 14, if it invades an area in which the targeted person has a high expectation of privacy, even if the search and seizure is, for the sake of argument, minimally intrusive.

There are three relevant decisions in this area where we have examined, under art. 14, provisions which involved the search and seizure of persons not suspected of a crime. In *Commonwealth* v. *Shields, supra* at 167, where we upheld against an art. 14 challenge suspicionless searches and seizures under G. L. c. 90, § 24, which authorized drunk driving roadblocks, we said, "[the] constitutionality [of roadblock seizures] is based

in large measure on the lower expectation of privacy tradition-
ally accorded to the motoring public." After determining the
level of privacy persons subject to the statute might reasonably
expect, we applied the balancing test. We concluded that the
"strong State interest in eliminating '[t]he carnage caused by
drunk drivers,' " *Commonwealth* v. *Shields, supra* at 167 n.3,
quoting *South Dakota* v. *Neville*, 459 U.S. 553, 558 (1983),
outweighed the intrusion of the limited search and seizure that a
roadblock involved.

In *Horsemen's Benevolent & Protective Ass'n, Inc.* v. *State
Racing Comm'n*, 403 Mass. 692, 706 (1989) (*Horsemen's*), we
applied art. 14 to strike down a regulation which required
random suspicionless drug testing (by means of monitored urine
samples) of State racing commission licensees. We rejected the
notion, accepted by other jurisdictions, that persons involved in
highly regulated industries, such as horse and dog racing,
should, as a matter of course, have a reduced expectation of
privacy in all respects.[12] Instead, we "focuse[d] on an
individual's reasonable expectations of privacy which are not
necessarily dependent on the amount of regulation in a particular
industry." *Horsemen's, supra* at 703. In the *Horsemen's* case,
we determined that, while the racing industry was highly
regulated, the regulations could not diminish the expectation of
privacy that a licensee had in urinating in monitored circum-
stances and in the information that could be extracted from the
urine sample. *Id.* at 704. In light of the fact that privacy expecta-
tions were not diminished, in order for the balancing test to suc-
ceed, the State's interest would need strongly to outweigh the
intrusion precipitated by the test. In the *Horsemen's* case, we
concluded that the highly intrusive test outweighed the State's
interest in deterring the use of illegal drugs at State racetracks.
*Id.* at 705.

In the *Guiney* case, *supra*, which involved a police depart-

---

[12]We pointed out that most instances where this theory has been upheld
have involved industries relating to security and public safety. See *Horsemen's
Benevolent & Protective Ass'n, Inc.* v. *State Racing Comm'n*, 403 Mass. 692,
702 (1989), citing *National Treasury Employees Union* v. *Von Raab*, 816 F.2d
170, 179-180 (5th Cir. 1987), aff'd in part and rev'd in part, 489 U.S. 656
(1989) (analogizing customs service officials to a highly regulated industry);
*McDonell* v. *Hunter*, 809 F.2d 1302, 1308 (8th Cir. 1987) (corrections offic-
ers); *Rushton* v. *Nebraska Pub. Power Dist.*, 653 F. Supp. 1510, 1524-1525
(D. Neb. 1987), aff'd, 844 F.2d 562 (8th Cir. 1988) (nuclear power plant
employees).

ment rule requiring drug testing of Boston police officers, we assumed, without discussion, that, as in the *Horsemen's* case, the police officers subjected to the search had a reasonable expectation of privacy in the contents of their urine or blood. *Guiney, supra* at 332. We then determined, after considering art. 14, that the Boston police commissioner had failed to carry the government's burden of persuasion, because the governmental need was not adequately compelling or concrete, in the absence of some reasonable showing that there was an existent drug problem in the Boston police department. See *id.*

We are concerned in this case with convicted persons who have a low expectation of privacy in their identity, and a new, and validated, technology which can, by means of a properly performed minimally invasive test, obtain and preserve an extremely accurate record of identification. The circumstances here most closely resemble those in the *Shields* case. The minor intrusion of a blood test is outweighed by the strong State interest in preserving a positive recorded identification of convicted persons. Our constitutional analysis under art. 14 parallels the conclusion reached by the Federal courts in decisions applying the balancing of interest analysis under the Fourth Amendment.[13]

4. The plaintiffs argued to the judge that, before the Act could take effect, it was necessary for the director to promulgate specific regulations to spell out when and how reasonable force could be used under § 4 (*a*) of the Act to acquire DNA samples from nonconsenting persons. The judge was not required to rule on the point because of the procedural posture of the case at the time the preliminary injunction entered. The fact that the injunction cannot be supported on the constitutional grounds discussed will inevitably lead to the plaintiffs' reassertion of their argument concerning the need for regulations in connection with the

---

[13]The decisions in *Matter of Lavigne*, 418 Mass. 831 (1994), and *Matter of a Grand Jury Investigation*, 427 Mass. 221, cert. denied sub nom. *A.R.* v. *Massachusetts*, 119 S. Ct. 171 (1998), are not helpful to the resolution of the art. 14 issue. Both of these cases concerned the acquisition of DNA blood samples where a reasonable basis in fact existed to conclude that the persons in question had committed a crime. Here, the collection identification information under the Act has a generalized purpose, unconnected to an immediate criminal investigation, and thus proceeds in the manner associated with fingerprinting and the collection of similar information from a person who lawfully comes under the State's authority to maintain a record of that person's identification.

reasonable force provision as they pursue a new preliminary injunction. We decide the issue now.[14]

The plaintiffs base their argument on the premise that, in the absence of regulations, the use of force to collect a DNA sample will create a substantial danger of contamination and misidentification of collected samples. In support of this contention, the plaintiffs refer to an affidavit from a biochemist with expertise in DNA testing that the collection of uncontaminated blood samples is a "critical step" in ensuring against unreliable DNA analysis and consequent erroneous identification. This, of course, is a self-evident proposition.

The Act is ambiguous concerning the need for regulations in connection with the reasonable force provision.[15] Section 4 (a) distinguishes between those who are to collect DNA samples[16] and those who are to assist in the collection process by using reasonable force to compel a sample from a person refusing to give one.[17] The existing regulations contain extensive provisions designed to ensure the integrity of the collection process and to avoid the risk of contamination. The Department of Correction has regulations defining when, and in what manner, reasonable force may be used against inmates. See 103 Code Mass. Regs. § 505.06-505.07 (1998). These regulations define what "force" is; differentiate between "[e]xcessive" and "[r]easonable [f]orce"; further define the circumstances when reasonable force may be used; provide that a command is to be used, in the absence of an emergency, before reasonable force is applied to an inmate; and require that, after the use of any force, the inmate

---

[14]In so doing, we reject the plaintiffs' argument that this aspect of the case is moot. See *Reproductive Rights Network* v. *President of the Univ. of Mass.*, 45 Mass. App. Ct. 495, 500 (1998); *Ayscough* v. *Andover*, 19 Mass. App. Ct. 125, 127-128 (1984).

[15]For example, G. L. c. 22E, § 4 (a), the provision detailing collection methods, states that "[t]he director may establish regulations or proceedings for the collection of DNA samples . . . ." However, in § 6, which outlines the duties of the director under the Act, it says, "[t]he director shall promulgate regulations governing the collection, submission, receipt, identification, storage and disposal of DNA samples."

[16]The persons identified as "collectors" of DNA samples are limited to "a physician, registered professional nurse, licensed practical nurse, phlebotomist, health care worker with phlebotomist training or a person licensed and trained by the director." G. L. c. 22E, § 4 (a).

[17]The persons who may assist in collecting DNA samples are "[d]uly authorized law enforcement and correction personnel . . . ." G. L. c. 22E, § 4 (a).

is to undergo a prompt medical examination. See 103 Code Mass. Regs. § 505.06-505.07. We may further assume that law enforcement and correction personnel take precautions (such as using protective gloves) before dealing with inmates or others in a medical setting requiring the use of reasonable force.

We believe those assisting in the collection of DNA samples under the Act know, or should know, what reasonable force is, and when and how it may be used. The term is defined in regulations of the Department of Correction, and can be considered to be a familiar concept, on which training has been given, to law enforcement and correction personnel. The regulations and protocols concerning collection of DNA samples set out procedures designed to collect blood in a medically sound and sanitary manner. The law does not require the director to promulgate regulations detailing how law enforcement and correction personnel should act in specific situations in complying with the Act. Undoubtedly, it is in the interest of the efficacy of the database required by the Act that each DNA sample, whether compelled or voluntary, be obtained under medically pristine conditions. State officials involved with the Act should be well aware that an effort to use a DNA record from the database either to identify a suspect or to establish his innocence (or for any other reason) will inevitably be challenged on the ground (among others) that the DNA sample was not properly obtained or that it had been contaminated with other human DNA, creating a possible misleading or false result. See *Commonwealth* v. *Vao Sok*, 425 Mass. 787, 794 n.11 (1997) (pointing out the possibility of contamination of a forensic DNA sample and further describing problems that might exist with certain types of DNA testing). Regulations governing the use of reasonable force by those assisting in the collection of DNA samples are neither mandated by the Act nor otherwise necessary to its implementation. The grant of a preliminary injunction would not be warranted on this ground.

5. The plaintiffs, and other interested parties who have filed briefs, have understandably raised questions concerning the possibility that those who have submitted DNA samples under the Act may suffer a violation of privacy, if DNA information about them is disclosed for a purpose other than identification. We briefly discuss some of these concerns.

The DNA analysis that the Act allows to be performed on the blood samples, and the limited distribution of the information,

should eliminate fears about wrongful privacy disclosures that might otherwise arise. While technological advances have made it possible to discover from minute blood samples genetic and medical information of a most invasive and personal nature, the STR testing process, and the restricted purpose for which a blood sample obtained under the Act may be tested, provides safeguards against wrongful use of the resulting information. We are told that STR testing avoids the acquisition of general genetic information, and that STR loci are "particularly appropriate for forensic use," in part because they can be "noncoding regions and therefore can be expected to be selectively neutral." National Research Council, The Evaluation of Forensic DNA Evidence 117 (1996). Further, even if the loci tested could reveal genetic information, the Act confines the use of the samples to a DNA analysis which generates on *"numerical identification information"* (emphasis added). G. L. c. 22E, § 1. In most cases, only the resulting "DNA record," which contains the numerical identification information derived from the samples by the analysis, may be distributed. See G. L. c. 22E, § 10.[18] In addition, the Act limits the purposes for which the DNA records may be distributed, and does not permit dissemination of the DNA samples themselves. The Act also imposes criminal sanctions on anyone who "purposely discloses" or "willfully obtains" DNA information without proper authorization. G. L. c. 22E, §§ 12, 13. The plaintiffs assert that § 10 (*c*)-(*d*) of the Act, which compels disclosure of the records to comply with Federal statutory or grant obligations, and allows disclosure of records for various scientific or humanitarian purposes,[19] may somehow lead to leakage of complete genetic

---

[18]General Laws c. 22E, § 10 (*a*), orders the director to distribute "records in his possession, including DNA records and analysis, to police departments in cities and towns, to the department, to the department of correction, to a sheriff's department, to the parole board or to prosecuting officers within the commonwealth upon request in writing or electronically." It is not clear what "records," other than DNA records, the director would have in his possession, and why this subsection, unlike the rest of § 10, allows the distribution of both DNA records and DNA analyses. Nor is it clear to us why this subsection, contrary to the others, does not restrict the purpose for which the listed departments may receive such information. We rest on the assumption that, because an analysis and record, by definition, may only consist of "numerical identification information," derived from a DNA sample, a department's request for any reason cannot reveal other private and protected information.

[19]The regulations are more restrictive than the Act itself and they do not

profiles.[20] Their speculation that data may be used wrongfully is contrary to the language of the Act and concerns provisions that are not before us.

6. The preliminary injunction entered in the Superior Court is vacated, and the case is remanded to that court for further proceedings consistent with this opinion.

*So ordered.*

---

authorize release of records for "humanitarian purposes." G. L. c. 22E, § 10 (*d*). See note 5, *supra.*

[20]When promulgating final regulations for the Act, the director may want to provide more detail as to tests that may be performed on the DNA samples that are being collected and stored. While the Act only authorizes use of those portions of DNA samples that are relevant for identification purposes, the indefinite storage of the entire DNA sample, see 515 Code Mass. Regs. § 1.05 (4), creates some concern that the samples could be misused at some point in the future to search for and disclose private genetic information.