Kaplan, Mitchell H., J.
Plaintiff Simplivity Corporation filed this action against its former employee, defendant John Hofdahl, on May 16, 2016 to enforce a covenant not to compete contained in his employment agreement. The case was first before the court on June 1, 2016, on Simplivity’s motion for a preliminary injunction. After reviewing the parties’ affidavits, supporting materials, and memoranda of law, the court determined that it would convene an evidentiary hearing on the motion. That hearing took place on June 21, 2016. Three witnesses testified and sixteen exhibits were admitted in evidence.
FACTS
In consideration of the affidavits, exhibits and testimony, and the reasonable inferences drawn therefrom, the court finds the following facts.
Simplivity is a corporation organized under the laws of Delaware with its principal place of business at 8 Technology Drive, in Westborough, Massachusetts. It was founded in 2009. It develops and sells so-called “hyperconverged infrastructure solutions” which converge a number of functionalities or applications into “all-in-one” products. Simplivity’s software is sold together with servers to integrate a collection of technologies that span across the functional areas of storage, computing, networking, hypervisor-based virtualization, containers, and infrastructure management. There are a number of companies providing these *484 types of solutions in this emerging market. See “IDC MarketScape: Worldwide Hyperconverged Systems 2014 Vendor Assessment,” December 2014.
In March 2014, Simplivity hired Edward Bannigan as its area sales manager for the Western Region of the United States. At or about the same time, Bannigan recruited Hofdahl to be a regional sales manager. Bannigan and Hofdahl had worked together at EMC for many years and briefly at another software company called Violin Memory. Hofdahl was one of five regional sales managers who reported to Bannigan. The two went through an initial training session together in Westborough in March 2014, where, among other things, they reviewed a manual entitled Sales Handbook, which explained in detail Simplivity’s “go to market strategy.” Hofdahl was not permitted to take the Sales Manual with him and never reviewed it again.
When he was hired, Hofdahl signed a Proprietary Information and Inventions Agreement (the Employment Agreement). Of relevance to this case, the Employment Agreement provided that Hofdahl could not disclose any Simplivity Proprietary Information, which included all business, technical and financial information that Hofdahl obtained during his employment. Also, Hofdahl agreed that “[flor the period of one year immediately following termination of [his] employment with the Company (for any reason, whether voluntary or involuntary), [Hofdahl] will not directly or indirectly: (i) Cause any person to leave their employment with the Company; (ii) Cause any person who was employed by the Company at any time during the past six months to become an employee of [h]is or a third party, (iii) Solicit any business partner; or (iv) Act in any capacity in or with respect to any Competing Business located within the Commonwealth of Massachusetts, the rest of the region known as New England, the rest of the United States, or anywhere else in the world.” “Acting in any capacity” was defined to include being an employee; being a “business partner” was defined to include any past, present or prospective customer, vendor supplier, or distributor of Simplivity; and “Competing Business” was defined to include any firm which competes or is reasonably likely to compete with any business that Simplivity “conducts or demonstrably anticipates conducting.” The Employment Agreement stated that it was to be governed by the laws of Massachusetts without regard to its conflict of laws provisions. It also included the standard recitation that any breach or threatened breach of this competition clause would cause “irreparable harm to the Company for which damages would not be an adequate remedy, and, therefore, the Company will be entitled to injunc-tive relief with respect thereto (without the necessity of posting any bond).”
While working for Simplivity, Hofdahl lived in Phoenix, Arizona, where he had lived for many years while working in sales for other technology companies. Hofdahl’s territory originally consisted of Arizona, New Mexico, Colorado, Utah, and Wyoming. He had a base salary of $128,000 plus commissions. His commission rate increased if he reached his quota, with further increases if he exceeded it. In 2014, Hofdahl sold approximately $1.9 million of Simplivity products which exceeded his quota by roughly 100%, and his total salary and commissions for the nine months that he worked for Simplivity was $315,000. Of those sales nearly $1.5 million came from Colorado and Utah.
In the fall of 2014, Bannigan informed his sales force that he would be adding sales representatives. This meant that the existing regional sales managers would have their regions reduced in geographic size. The existing managers would be able to complete sales with any prospective customers then in the pipeline, but could initiate no new sales calls in areas reassigned to other representatives. Hofdahl’s territory was reduced to Arizona and New Mexico, at the same time his annual quota increased to $2.4 million. Hofdahl earned $276,000 in 2015.
Each quarter, Bannigan convened a quarterly business review meeting for all of the sales representatives working in the western region of the United States. At these meetings, Simplivity’s chief executive officer and the chief sales officer for sales in the Western Hemisphere made a presentation concerning Simplivity that could include a discussion of planned product enhancements and the company’s financial position. Each sales representative reviewed activity in his region, including marketing successes and instances in which a sale was lost to a competitor, and the new business pipeline. There was also a discussion of the strengths and weaknesses of Simplivity’s and competitors’ products and sales approaches that had been successful and those that had not worked. The last quarterly review that Hofdahl attended was February 18 and 19, 2016.
In 2015, Hofdahl’s sales were generally in line with his quota requirements through the third quarter (he recorded 102% of quota in Q3), but he did very poorly in the fourth quarter, closing less than $100,000 of sales. Hofdahl attributed this fall-off to the loss of Utah and Colorado and his view, based on twenty years of technology sales in the southwest, that Arizona-based companies were slow to adopt new technologies. He also attributed his poor performance to personal issues related to a post-divorce child custody dispute with his former wife that began in October.
In late November 2015, he had a meeting with Martin Sanders, Simplivity’s vice president for sales in the Americas. Sanders had also known Hofdahl for many years and worked with him at EMC. Indeed, Sanders had called on Hofdahl for his impressions regarding Simplivity and a reference, before Sanders accepted his position with Simplivity in July 2014. At the meeting, Sanders expressed concern regarding Hofdahl’s productivity decline and also about the fact that sales that Hofdahl had reported as completed, apparently in the third quarter, had to be “debooked,” a very serious matter to Sanders. Sanders was dis *485 couraging about the likelihood that Hofdahl could be promoted to a management position in the near future, but encouraged Hofdahl to work hard and make better inroads in the Arizona market. At the meeting, Hofdahl explained that his work had been impacted by the custody dispute, but did not complain about the reduction of the size of his territoiy.
The court finds that it was not unusual for a growing company like Simplivfiy that was selling a product that was an emerging, “disruptive,” technology to increase its sales force as it matured which, of necessity, would decrease the geographic area assigned to existing sales representatives. A regional sales representative, like Hofdahl, could hope that as the sales force increased in his region, he could move into a position in which he would begin to manage other representatives. However, Hofdahl was neither promised a promotion nor that his geographic region would not be reduced as the company’s sales grew.
In late 2015, Andrew Perry, who had also worked with Hofdahl in the past, called to recruit Hofdahl to join Maxta, Inc. Maxta was a small software company, fifty or so employees, that was also tiying to sell products in the hyperconverged market space. (The difference between the “solution” being sold by Maxta and Simplivity’s products is discussed below.) Perry was the global sales director for Maxta, and offered the position of director of United States sales to Hofdahl. In addition to sales, Hofdahl’s job would include building and training a U.S. sales force.
Hofdahl told Bannigan about Perry’s offer and in mid-March 2016 explained that he was leaning toward accepting it. Hofdahl was then about to leave for vacation, and Bannigan suggested that Hofdahl think through the matter while on vacation before making a decision. When Hofdahl returned, he told Bannigan that he thought it was best for him to start fresh at Maxta. It would be an opportunity to have a management position and build a sales force. Hofdahl gave his notice on March 30, 2016.
On April 5, 2016, Hofdahl met with Bannigan for several hours in California. He went over the sales opportunities on which he was working and his pipeline to assist Bannigan in transferring his region to other sales representatives. He asked Bannigan if he thought that Simplivity’s CEO would cause Simplivfiy to file a law suit to enforce his covenant not to compete. Hofdahl explained that he did not think that Maxta’s potential customers were the same as Simplivity’s and that he would not “engage” with any of the customers or business partners that he had dealt with while at Simplivity or recruit any Simplivity employees. Bannigan suggested that Hofdahl put that in an email, which he would forward to senior management. Hofdahl wrote the email and sent it to Bannigan while he and Bannigan were still together. Bannigan did not tell Hofdahl that Simplivity would not bring suit, nor did he tell Hofdahl that he would inevitably be using Simplivity’s confidential information to the disadvantage of Simplivfiy, if he accepted the position with Maxta. Certainly, Bannigan as the person responsible for sales in all of the western United States would logically have been concerned if he thought that, with Hofdahl directing United States sales for Maxta, Maxta would be in a position to win customers that might otherwise purchase Simplivfiy products.[1]
This action was filed on May 16, 2016. The court will reserve its discussion of whether Hofdahl is in possession of any Simplivity confidential information that he would inevitably use to cause Simplivfiy irreparable injury in its discussion of the legal standards to be applied to the resolution of this motion.
DISCUSSION
To prevail on its request for a preliminary injunction, Simplivity must show a strong likelihood of success on the merits of its claims, that it will suffer irreparable harm without the requested injunctive relief and that its harm, without the injunction, outweighs any harm to Hofdahl from being enjoined. GTE Products Corp. u. Stewart, 414 Mass. 721, 722-23 (1993); see also Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 710 (1990). “Whatmatters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but ratiher the risk of such harm in light of the party’s chance of success on the merits.” Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980). “Onlywhere the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id. “[T]he significant remedy of a preliminary injunction should not be granted unless the plaintiff) ] ha[s] made a clear showing of entitlement thereto.” Student No. 9 v. Board of Educ., 440 Mass. 752, 762 (2004). See also Landry v. Attorney General, 429 Mass. 336, 343 (1999) (remedy of a preliminary injunction “should not be grant[ed] unless [the plaintiffs] by a clear showing, carrie[d their] burden of persuasion”).
The standards to be applied in determining whether to enforce restrictive covenants in employment agreements are well established under Massachusetts law.
Employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer. Novelty BiasBinding Co. v. Shevrin, supra, at 716. Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the good will the employer has acquired through dealings with his customers. See All Stainless, Inc. v. Colby, supra, at 779-80. Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced. Richmond Bros, Inc. v. Westinghouse Bdcst. Co., Inc., 357 Mass. 106, 111 (1970).
*486 Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 (1974). Of course, every case in which a previous employer of a defendant seeks to enforce restrictive covenants against a former employee will turn on the sometimes difficult application of these standards to the facts presented by the case then at bar.
Likelihood of Success on the Merits
In the present case, the covenant not to compete is veiy broad, but in Massachusetts a court will enforce it only to the extent that it is necessary to protect Simplivity’s business interests, i.e., only to the extent Hofdahl is in a position “where he can harm” Simplivity by use of its good will, trade secrets or confidential information. See All Stainless, 364 Mass, at 778-79. It is Simplivity’s burden to “show that information constitutes a trade secret.” Harvard Apparatus, Inc. v. Cowen, 130 F.Sup.2d 161, 174 (D.Mass. 2001) (applying Massachusetts law). See also Data Gen. Corp. v. Grumman Sys. Corp., 825 F.Sup. 340, 357 (D.Mass. 1993) (applying Massachusetts law) (a plaintiff “must identify the trade secrets and carry the burden of showing that they exist").
As a starting point, Simplivify concedes that Hofdahl is a salesman, not an engineer, and he has no knowledge concerning the engineering of its software, i.e., he is not in a position to assist Maxta in enhancing its products by using Simplivify’s trade secrets. Rather, Simplivity focuses on Hofdahl’s knowledge of Simplivity’s approach to sales and the strengths and weaknesses of its products in relation to its competitors.
Simplivity claims that it has developed unique techniques in selling software that constitutes a new, “disruptive” technology produced by a new company that does not yet have a track record of success. It claims that this information is included in its Sales Manual that was shared with Hofdahl in March 2014, when he was trained, and which was collected from him after the training, apparently to preserve its confidentiality. Perhaps so, but all that was presented to the court was Simplivify’s conclusoiy opinion that such sales techniques exist and are unique. Simplivify’s believing in the uniqueness of its approach is not the same as proving that these techniques are dissimilar from those of other successful, start-up, technology companies. All of Hofdahl, Bannigan, and Sanders have worked together in the sale of technology products for many years before Simplivify. They recruited each other. If this case were only about non-specific methods of selling new software products generated by new market entrants, the court would be reluctant to find sufficient “good will” or “trade secrets” to support the enforcement of a covenant not to compete.
This is also not a case about trading on good will that Hofdahl may have developed with Simplivity customers. First, Hofdahl has expressly stated that he will not attempt to sell to Simplivity customers or potential customers that he contacted while working for Simplivity, and the court is prepared to enjoin him from doing that. Moreover, as a practical matter, a company that has adopted Simplivity’s solution is not apt to be in the market for a different hyperconvergence solution for at least several years. Also, as discussed below, Hofdahl maintains that Maxta’s target customers are different from Simplivity’s.
Sanders, the director of sales in the Americas for Simplivify, testified at the hearing. The court finds him to veiy creditable and candid. When asked about the confidential information that Hofdahl possessed that he could use to Simplivity’s disadvantage, Sanders had difficulty describing it with veiy much precision. He said that Hofdahl would know which resellers had been willing to work with Simplivity and which industries were early adopters of hyperconvergent technology. Sanders also admitted that this was the type of information that anyone with some sophistication concerning this product, such as analysts for independent, technology consulting/reporting firms like IDC and the Gartner Group, could readily generate. He expressed concern that knowledge concerning which of Simplivity’s sales representatives were most effective would be useful to someone building a sales force, but that confidential information can be protected with a non-solicitation injunction. Sanders explained that Hofdahl would have knowledge not only of his own pipeline of potential Simplivity customers, but would have heard other sales representatives talk about their customer leads at the February 2016 quarterly business review. While that kind of pipeline information is clearly confidential, Bannigan and Sanders agreed that six months was the outside length of Simplivity’s sales cycle and most of its sales occurred within a seventy- to ninety-day window.
Sanders also pointed out that Hofdahl’s position at Maxta, where he will be responsible for sales across the United States, will require him to assemble a nationwide sales force, and he was exposed to the manner in which he and Bannigan built the Simplivity force. In that regard, it seems that the knowledge that Hofdahl might have gained concerning how skilled sales executives build a sales force is in the nature of general skill, knowledge, and experience that an employee is permitted to take with him when he moves to a management position at another company. See, e.g., J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 739-40 (1970).
The court, however, does find that Hofdahl received important, confidential information at the quarterly business reviews where all of the sales representatives discussed their wins and losses in competitive sales situations. While much information concerning the different products sold by competing vendors in the hyperconverged infrastructure market is published by market analysts, the open discussion among the Simplivify sales representatives, and the engineers that supported them, concerning the strengths and weaknesses of Simplivity’s products, the industries in which it worked the best, and the sales approaches that worked well and less well is both confidential and valu *487 able. It certainly could give Hofdahl an advantage in a competition in which Maxta and Simplivity were tiying to sell software to the same potential customer. Whether such a circumstance is likely to occur will be addressed in the section of this memorandum of decision which addresses the question of irreparable injury.
The court will respond briefly to two arguments that Hofdahl asserts in opposition to Simplivity’s motion. First, he argues that Hofdahl lived in Arizona when he accepted the position with Simplivity and had lived there for many years. He signed the employment agreements in Arizona. Arizona was also his residence and business address while he worked at Simplivity. He argues that even though the Employment Agreement states that it is to be governed by the law of Massachusetts without application of Massachusetts principles of conflict of laws, the court should undertake a conflict of law analysis and then apply Arizona law to the question of whether the covenant not to compete should be enforced. Hofdahl asserts that under Arizona law covenants not to compete “are disfavored and are strictly construed against the employer.” Bryceland u. Northey, 160 Aiiz. 213, 216 (App. 1989). Additionally, in Arizona courts cannot rewrite restrictive covenants that are broader than necessary to protect the employer and must not enforce them at all, the so-called “blue pencil rule.” See Varsity Gold, Inc. u. Porzio, 202 Ariz. 355, 358 (App. 2002). The court disagrees with Hofdahl’s choice of law argument. Simplivily has its principal place of business in Massachusetts, which is where it trains its sales representatives. Simplivity did not engage in any unconscionable act in providing that its employment agreements will be governed by the law of Massachusetts. This court sees no reason not to apply Massachusetts law in deciding whether and the extent to which the covenant not to compete should be enforced.
Hofdahl also argues that the reduction in the size of his sales territory resulted in a material change in his employment from that which existed when he first began work, thereby vitiating the non-compete provision of his employment agreement under the rule originally announced in F.A. Bartlett Tree Experts v. Barrington, 353 Mass 585, 587-88 (1968). The court disagrees. Neither Hofdahl’s job title nor his job responsibilities changed during his two years of employment. There is no evidence that Hofdahl was promised that his sales region would not shrink as the company grew and added sales representatives. The court credits the testimony of Simplivity’s witnesses that this is a natural progression for a company as its products become better known and accepted in the marketplace. In the end, whether there has been “a modification of a previous agreement, rather than an implied revocation or termination of the agreement as the result of such a subsequent change [in the circumstances of the employee’s employment], depends upon the intention of the parties. ” Astro-Med v. Nihon Kohden of America, 591 F.3d 1, 17 (1st Cir. 2009). See also Intertek Testing Servs. N.A., Inc. v. Curtis Strauss, LLC, 2000 WL 1473126 at *6 (Mass.Super.Ct. August 8,2000) (Gants, J.). In this case, even though the reduction in Hofdahl’s sales territory may have negatively impacted his income, this was always a possibility and did not constitute a revocation of the Employment Agreement and the restrictive covenants that were important provisions of it. Hofdahl was an employee at will. The decrease in territory and increase in quota, as well as the negative review he received from Sanders, may have been good reasons for Hofdahl to accept a position with a firm that offered him management level responsibilities and better opportunities for professional growth and financial rewards. But, they did not invalidate the covenant not to compete, to the extent that it was otherwise enforceable.
Irreparable Injury
As noted above, likelihood of success on the merits must be considered in the context of the harm that a plaintiff will suffer if an injunction does not issue, as compared to the harm the defendant will suffer if enjoined. It is, of course, the plaintiffs burden to present evidence of immediate and irreparable harm. See, e.g., Carroll v. Marzilli, 75 Mass.App.Ct. 550 (2009) (“[a]s private parties seeking a preliminary injunction ... the plaintiffs must show immediate irreparable harm”). See also Town of Burlington v. Department of Educ. of Mass., 655 F.2d 428, 432 (1st Cir. 1981) (party seeking preliminary injunction must show danger of immediate, irreparable injury).
If Maxta was a current competitor of Simplivily, for example because they had met or were likely to meet in head-to-head competition for customers looking for hyperconvergent infrastructure software, the circumstances supporting Simplivity’s claim that it will suffer irreparable injury would be much different. Simplivity offered in evidence industry reports prepared by IDC and Gartner that list Maxta as a new company offering products that are, or are part of, Hyperconverged Infrastructure Solutions. See, e.g., “Simplify the Mid-market Data Center With Hypercoverged Infrastructure Solutions,” Gartner, Inc., June 24, 2015. However, it is undisputed that Simplivily has never competed with Maxta for a sale; indeed, it has never even encountered Maxta in the market place. Although Simplivity produced a 2014 email prepared by its internal market researchers that makes reference to Maxta, the court credits Hofdahl’s testimony that he had never heard of Maxta before being contacted by Andrew Perry near the end of 2015.[2]
In response, Simplivity points the court to the market trajectory of a company called Springpath. Bannigan testified that up until four months ago, Simplivily had never encountered Springpath in the marketplace, but now it is competing for business against Springpath in 30% to 40% of its engagements. While Simplivity suggests that this could happen with *488 Maxta, its witnesses did not testify that this was likely to happen or that there was something about Maxta’s product that made this a realistic possibility. Rather, the witnesses simply testified that they did not see Springpath coming, and look what happened. Therefore, Maxta’s rapid ascent is a possibility.
Hofdahl responds that Maxta is focused on different customers. Simplivity sells its software as part of a package that includes new servers. Most often its software is packaged with servers manufactured by various vendors by value added resellers, but it also partners with hardware vendors to sell a complete solution which it calls Omni Cubed. According to Hofdahl, Maxta’s software is intended to be purchased by firms that will load it on its existing hardware. This seems to be consistent with Gartner’s description of Maxta: “Maxta’s HCIS solution enables midmarket organizations who prefer to maintain long-standing relationships with server vendors, partners and value-added resellers or to leverage existing hardware investments a means by which to do so.” It is also consistent with the description of Maxta contained in the internal Simplivity email: “Maxta’s value is that you’re supposed to save cost as you don’t need to buy new hardware . . . instead, you can just convert what you already have. But there’s a fundamental flaw here, which is that you need to install on bare metal ...” Hofdahl also testified that Maxta’s software performs far fewer functions than Simplivity’s product. To the extent that the court understands the third-party market research that was placed in evidence, it appears that Maxta’s products have a price point well below Simplivity’s.
The court finds the question of whether to enforce the covenant not to compete and enjoin Hofdahl from working for Maxta for some period by the entry of a preliminary injunction a very close one. In the end, however, it is Simplivity’s burden to prove to the court that it is likely to suffer irreparable injury if an injunction does not enter. As noted above, if there was evidence that Maxta was competing for the same customers as Simplivity, or about to compete for them, the court would be inclined to enter an injunction preliminarily enforcing the non-compete for some period of time. However, the only evidence presented was that a different company, Springpath, had experienced an unpredicted, rapid market ascent and become a Simplivity competitor. Testimony that this might happen to Maxta, unsupported by any evidence that there is something particular concerning Maxta that makes this reasonably likely to happen, is insufficient to carry Simplivity’s burden of proof.[3]
Further, were the court to preliminarily enjoin Hofdahl from working for Maxta, there appears to be a reasonable likelihood that Maxta would not pay him, nor hold his job open. It is a relatively small, start-up company. While no Maxta financial information was introduced, the fact that one of Hofdahl’s jobs is to build a United States sales force suggests that its revenues are still small. Hofdahl’s loss of salary and an opportunity to move into a management level sales position could irreparably injure him.
While imperfect at best, the court will attempt to fashion a preliminary injunction that protects Simplivity from the possibility that Maxta becomes its competitor.[4]
ORDER
For the foregoing reasons, the plaintiffs motion for a preliminary injunction is ALLOWED, in part, and DENIED, in part, as follows.
The defendant John Hofdahl is preliminarily enjoined from engaging in the following activities:
1. Until March 30, 2017, soliciting any current employee of Simplivity to work for Maxta or suggesting to any other third party that it recruit a Simplivity employee.
2. Disclosing any Simplivity Proprietary Information.
3. Until March 30, 2017, directly, or indirectly, contacting any Simplivity customer or any potential Simplivity customer that Hofdahl contacted with a view to selling it a Simplivity product while Hofdahl was employed at Simplivity.
4. Until August 19, 2016, directly, or indirectly, contacting any customer identified as in Simplivity’s “pipeline” of potential customers at the February 2016, Simplivity western region quarterly business review.
5. Until March 30, 2017, if Maxta finds itself in competition with Simplivity to sell its product to a particular potential customer, Hofdahl shall not participate either directly or indirectly in that sales opportunity.
The plaintiffs request for preliminary injunctive relief is otherwise denied.

 Simplivity argued in its original pleadings and at the June 1,2016 hearing that Hofdahl had taken confidential information with him. This allegation was not addressed at the June 22nd evidentiary hearing. The court finds that if Hofdahl retained any confidential information on a hard drive when he returned his laptop to Simplivity, it was inadvertent and not used by him while at Maxta. The court finds that Hofdahl was always upfront about his plans to join Maxta, conscious of the restrictions in his Employment Agreement, and intent on demonstrating to Simplivity that he would not make use of Simplivity’s confidential information in his new job.

 Indeed, the email is very disparaging and dismissive of Maxta’s product.

 While there was evidence that a value added reseller was packaging Maxta software with a server in a product called MaxDeploy that might be competitive with Simplivity’s product, so far there have been no sales of this product. Moreover, Hofdahl has been with Maxta for nearly three months, and Simplivity has still not encountered Maxta in the marketplace.

 he court thanks counsel for both parties for their thoughtful and effective presentation of the material, relevant evidence on very short notice and excellent advocacy on behalf of their respective clients.