IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 7, 2004

## STATE OF TENNESSEE v. MACK T. TRANSOU

**Direct Appeal from the Circuit Court for Madison County**
**No. 02-360    Roy B. Morgan, Judge**

**No. W2003-02966-CCA-R3-CD - Filed May 13, 2005**

Following a jury trial, Defendant Mack Transou was convicted of aggravated burglary and rape. He was sentenced to concurrent sentences of fifteen years for aggravated burglary and sixteen years for rape. On appeal, Defendant argues that the evidence presented at trial was insufficient to support the jury's verdict, that the trial court erred in admitting DNA evidence, and that his sentence was improper in light of *Blakely v. Washington*. We conclude that the evidence was sufficient to support the Defendant's convictions, the DNA evidence was properly admitted, and that the trial court did not err in its application of one enhancement factor when sentencing Defendant. Accordingly, we affirm Defendant's convictions and sentences.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT E. WEDEMEYER, JJ., joined.

Richard L. Finney, Attorney, Jackson, Tennessee, for the appellant, Mack T. Transou

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General, Criminal Justice Division; James G. (Jerry) Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, the State of Tennessee

**OPINION**

**I. Factual Background**

In the early hours of the morning on December 23, 2001, the victim, Shirley Ann King, awoke to the sound of Defendant crashing through her bedroom door. Defendant grabbed her and though the victim fought to push him away, he succeeded in raping her. When the police arrived, they found the victim visibly upset and extremely frightened. Although the victim identified Defendant at trial, on the morning of the assault she was only able to give investigators a general description of her assailant, including his general age, height, weight, race, and clothing. Police

determined that Defendant had broken in and fled through the victim's back door, as evidenced by the broken glass, cut screen, and damage to the door itself. Investigators were not able to collect any usable fingerprints from the victim's home. The victim was taken to the emergency room, where physicians performed an examination and sexual assault kit. An examination of the sexual assault kit revealed the presence of semen. DNA from semen collected as part of the sexual assault kit was compared with DNA from a sample of Defendant's blood, and they matched. According to the crime lab technician who testified at trial, the probability that another person besides Defendant would have the exact DNA profile is one out of a number so large that it exceeds the current world population. Specifically, the crime lab technician testified that, based on the statistics, no person other than Defendant could have been the source of the semen collected during the physical examination of the victim.

Defendant was convicted of one count of aggravated burglary and one count of rape. Following a sentencing hearing, Defendant was sentenced to concurrent sentences of fifteen years for aggravated burglary as a Range III career offender and sixteen years for rape as a Range II violent offender. Defendant filed a motion for judgment of acquittal or new trial, which was subsequently denied.

## II. Analysis

### A. Suppression of DNA Evidence

First, Defendant argues that the trial court should have granted his motion to suppress DNA evidence. Before denying the motion, the trial court held an evidentiary hearing. At this hearing, the following evidence was introduced:

Defendant submitted a blood sample for DNA testing on three different occasions. The first blood sample was submitted in 1999 during Defendant's intake into the West Tennessee State Penitentiary, where he was in custody for a felony conviction for an offense that he committed in 1997. During intake, the Tennessee Department of Correction sought to obtain a blood specimen from inmates for purposes of providing DNA samples. During the procedure, nurses explained the procedure to a group of inmates. Inmates were told they were required to submit a blood sample, although they may refuse to do so if they so choose. They were given an opportunity to ask questions and also were given a consent form to read and sign. After an inmate consented to having his or her blood drawn, a nurse would draw a blood sample which would then be sent to the Tennessee Bureau of Investigation. Defendant initially went through this intake procedure in 1999, signed the consent form, and submitted a blood sample. This blood sample was turned over to the Tennessee Bureau of Investigation, and Defendant's DNA profile was entered into a Combined DNA Index System (CODIS). CODIS is a local, state, and national database of DNA profiles collected from crime scene evidence as well as convicted offenders.

Defendant submitted a second blood sample in 2000, also at the West Tennessee State Penitentiary under the same procedure as in 1999. The sample submitted in 2000, however, was not

entered into the CODIS system because Defendant's DNA profile was already in the database at that time.

Defendant first became a suspect of the rape and burglary in the present case when a match was made on CODIS between Defendant's DNA index profile and the DNA index profile of semen collected from the victim's sexual assault kit. Police took Defendant into custody in May of 2002 in order to interview him and obtain an additional blood sample which could be used to compare with the DNA profile in the victim's sexual assault kit. According to the officer's testimony, during police questioning, Defendant told the officer he was "welcome to take his blood and DNA" and signed a consent of search form, giving written permission for the taking of a blood sample for DNA analysis. Defendant claimed during his testimony that the signature on the consent form was not his, but rather was forged by the officer. Nevertheless, Defendant submitted a blood sample to officers and was released from custody.

Defendant argued in his motion to suppress that the blood sample collected in 1999 was an illegal search, and asked the court to suppress any and all evidence seized as a result of the 1999 search, including the subsequent blood sample submitted in 2002 during police questioning. Defendant based his argument on the contention that the 1999 blood sample was submitted in violation of Tennessee Code Annotated § 40-35-321 because Defendant's offense was committed in 1997. The statute requires courts to order any person convicted of a felony offense committed on or after July 1, 1998, to provide a biological specimen for the purpose of DNA analysis. Tenn. Code Ann. § 40-35-321(d)(1) (2004). Defendant argued that because the statute did not apply, the collection of the DNA sample was illegal, and all of the DNA evidence collected by the State in this case was a direct result of this illegal search and should have been suppressed. The trial court held that even though the law requiring biological specimens for DNA analysis from convicted offenders did not apply to Defendant, he "freely, voluntarily and intelligently" consented to giving a blood sample on each of the three occasions in 1999, 2000, and 2002. The court emphasized that Defendant's consent to give a blood sample to officers in 2002 during questioning "was sufficient even if the others [in 1999 and 2000] were not upheld under these circumstances." Accordingly, the trial court denied Defendant's motion to suppress.

On appeal, Defendant argues that the trial court should have granted his motion to suppress because the statute requiring submission of a biological specimen for DNA testing did not apply to him, and because he did not give effective consent for the extraction of his blood for DNA testing. Furthermore, Defendant argues that the CODIS database used by the State for purposes of conducting DNA matches is unconstitutional. The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this court is not bound by the trial court's conclusions of law. *State v. Simpson*,

-3-

968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975)

Defendant first argues that the trial court erred by retroactively applying to Defendant's 1997 conviction a 1998 statutory provision requiring blood and DNA samples to be taken from all convicted felons. Tennessee Code Annotated section 40-35-321(d)(1) requires that, "[w]hen a court sentences a person convicted of any felony offense committed on or after July 1, 1998, it shall order the person to provide a biological specimen for the purpose of DNA analysis[.]" Defendant was convicted in 1999 of driving after having been declared a habitual motor vehicle offender. However, the offense was committed in 1997. The trial court specifically held that "at the time he gave the first sample in TDOC, of course, the law didn't apply to [Defendant] under that statute requiring the DNA of the defendant." We agree. Defendant was not required under any statute to submit a blood sample for DNA analysis when he did so in 1999. Defendant argues that because the DNA testing was not required by statute, all evidence resulting from the 1999 blood sample should have been suppressed. The State argues that the trial court properly denied Defendant's motion to suppress because, even though the statute did not require Defendant to give a DNA specimen for analysis, he voluntarily consented to the drawing of his blood. In denying Defendant's motion to suppress, the trial court agreed with the State's reasoning and held that Defendant "freely, voluntarily and intelligently knew what he was doing at the time he signed the form giving consent for that specimen [in 1999 and 2000], after being given the opportunity to refuse." On appeal, Defendant argues that he never, at any time, gave effective consent for the withdrawal of his blood.

The withdrawal of blood from a subject for purposes of serological typing and DNA analysis constitutes a search within the constraints of the Fourth Amendment and, therefore, a search warrant is generally required. *See Schmerber v. California*, 384 U.S. 757, 767-72 (1966); *State v. John Chapman*, 1997 Tenn. Crim. App. LEXIS 950, at *50 (Tenn. Crim. App., at Nashville, Sept. 30, 1997), *perm. app. denied* (Tenn. 1998); *see also State v. Jackson*, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993), *perm. to appeal denied* (Tenn. 1994). The Fourth Amendment of the United States Constitution states the following:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Further, Article I, Section 7 of the Tennessee Constitution provides

> [t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an

officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

The purpose and intent of Article I, Section 7 is identical with that of the Fourth Amendment, which is to "safeguard the privacy and security of individuals against the arbitrary invasions of government officials." *Simpson*, 968 S.W.2d at 779 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)); *State v. Gonzalez*, 52 S.W.3d 90, 95 (Tenn. Crim. App. 2000). The language of both the federal and state constitutions mandate that "a warrantless search or seizure is presumed unreasonable, and the evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971). "One of the specifically established exceptions to both a warrant and probable cause is a search that is conducted pursuant to a voluntarily given consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted); *State v. Troxell*, 78 S.W.3d 866, 871 (Tenn. 2002); *see also State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996). The burden of proof rests upon the State to show, by a preponderance of the evidence, that the consent to a warrantless search was given freely and voluntarily. *Schneckloth*, 412 at 219; *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *Bartram*, 925 S.W.2d at 230. The question of whether the appellant voluntarily consented to the search is a question of fact which focuses upon the totality of the circumstances. *Schneckloth*, 412 U.S. at 248-249. In order to pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion. *Troxell*, 78 S.W.3d at 871; *State v. Brown*, 836 S.W.2d 530, 547 (Tenn. 1992).

In *State v. Brown*, police obtained the defendant's verbal permission to search his home, and he signed a consent form that explicitly made reference to the defendant's right to refuse to consent to the search. *Id.* The court in *Brown* held that without further evidence which would undermine the voluntariness of the consent, it would not suppress the evidence that was seized by police during the search. *Id.* Alternatively, in *Bumper v. North Carolina*, the United States Supreme Court held that the defendant's consent to a search was invalid. *Bumper*, 391 U.S. at 550. In that case, a 66-year-old widow, who lived at the end of an isolated dirt road in a rural area, allowed four law enforcement officials to search her home, but only after they claimed to have a warrant for the search. *Id.* The Court held the consent was coerced because "when a law enforcement officer claims authority to search . . . under a warrant, he announces in effect that the occupant has no right to resist the search." *Id.*

In the case *sub judice*, the trial court, following the suppression hearing, concluded that Defendant's consent to having his blood drawn and analyzed in 1999 and 2000 was voluntary. The court ruled:

As to the issue dealing with the biological specimen that was taken while this Defendant was in the Tennessee State Penitentiary, I note two or three things. It was very clear that the individuals, as Mr. Transou also testified to, are brought in a group. It might be 10, it might be 20 or somewhere in between, and they are advised of the procedure. The procedure under which Mr. Transou was taken in dealt with this statute requiring DNA analysis, but it's very clear from the consent forms, 2A and 2B, let's talk about 2A first, that it was a consent for DNA analysis. It does state – set forth the statute and the consequences of not giving it and the requirement of the law to give it, but it also clearly has the provision for the defendant to refuse to participate in the testing process, even though there may be consequences, as the Defendant testified to. But the prior witnesses testified that this is explained, including the right to refuse and this Defendant did--as he's testified, this is his signature. He did sign the form on September the 7th of '99 giving consent to take the biological specimen. He had a chance to refuse. The only thing that concerns the court is it's being taken under the circumstances as if that statute required it. I note that as a similar situation on this August the 9th of 2000 [sic]. Again, the same type form, consent for DNA analysis, same type [sic] circumstances, again the Defendant given an opportunity to refuse it but didn't. He has his own explanation as to why he didn't refuse it and that's that he would suffer consequences if he didn't, but he is well experienced in the TDOC system, in the way it operates. He even testified he knew when the law [requiring a biological specimen for DNA analysis] took effect. I find that he freely, voluntarily and intelligently knew what he was doing at the time he signed the form giving consent for that specimen on both those occasions, after being given the opportunity to refuse.

The evidence does not preponderate against this finding. Defendant argues that his consent was not voluntary because he gave his consent under the threat of discipline if he refused to sign the consent form and submit a blood sample. Furthermore, Defendant argues that the fact that section 40-35-321 did not actually apply to him further undermines the voluntariness of his consent, since that statute was the basis of the DNA sample collection. However, these facts do not preponderate against the trial court's finding that Defendant's consent was nevertheless valid. Although Defendant was told he was "required" to give a biological specimen for DNA analysis during the intake procedure, he also had the benefit of the consent form itself, which explained the basis of the testing, as well as someone who explained the procedure and was available to answer questions. The consent form itself consists of one half of one page, and clearly states that the requirement of providing a biological specimen for DNA analysis applied to "any person convicted of any felony offense committed on or after July 1, 1998," and gave Defendant an option to refuse to provide a sample by signing next to the words, "I am refusing to participate in the DNA testing process." These facts are distinguishable from the facts in *Bumper*, where the Court held that the defendant's consent to search was coerced where officers purported to have authority to search under a warrant, though they did not. *Bumper v. North Carolina*, 391 U.S. 543 (1968). Here, it cannot be said that Defendant's consent was coerced. Whatever threat of discipline Defendant believed he might be subject to for refusing to submit to the DNA testing process in accordance with the statute did not

effectively tell Defendant that he had "no right to resist the search." *See Bumper,* 391 U.S. at 550. Like the defendant in *Brown*, this Defendant intelligently and voluntarily consented to a search, even though he was aware of his right to refuse. *See Brown*, 836 S.W.2d at 547.

Defendant also argues that the blood sample he submitted in 2002 while in police custody for investigation, was coerced. During the suppression hearing, Defendant claimed that the officer who was interviewing him forged Defendant's signature on the form giving police consent to search "his body" by taking a blood sample for DNA analysis. The trial court, however, found the officer's testimony to be credible, and Defendant's testimony not credible. The court held that it was, in fact, Defendant's signature on the consent form and that, under all the circumstances, Defendant's consent was freely, voluntarily, and intelligently given. The evidence does not preponderate against this finding. Without further evidence that would indicate Defendant's consent was invalid, we will not disturb the trial court's decision.

Defendant next argues that the trial court should have granted his motion to suppress because the State's collection of DNA samples pursuant to Tennessee Code Annotated section 40-35-321 (hereinafter "the DNA statute") and use of the CODIS database as an investigatory tool is unconstitutional. He contends that the DNA statute violates the Fourth Amendment's prohibition against unreasonable searches and seizures because it compels extraction of blood for a DNA sample in the absence of individualized suspicion or probable cause of any criminal wrongdoing. The State argues that the collection of Defendant's blood was not a search at all because it was done for purposes of identification only. Furthermore, the State argues that if the collection of DNA pursuant to the DNA statute is considered a "search" for purposes of the Fourth Amendment, it is nevertheless reasonable because it falls within the "special needs" exception to the Fourth Amendment's warrant requirement. Alternatively, the State argues that the collection of DNA samples pursuant to the DNA statute is reasonable under the totality of the circumstances, when the interests of the State are weighed against the expectations of privacy of the offenders involved.

Contrary to the State's argument, the extraction of blood for DNA profiling does constitute a "search" within the meaning of the Fourth Amendment. *See Skinner v. Ry. Labor Executives' Ass'n* 489 U.S. 602, 616 (1989) ("we have long recognized that a compelled intrusion into the body for blood to be analyzed for alcohol content must be deemed a Fourth Amendment search.") (citation omitted); *see also Winston v. Lee*, 470 U.S. 753, 760 (1985); *Schmerber v. California*, 384 U.S. 757 (1966); *State v. John Chapman*, 1997 Tenn. Crim. App. LEXIS 950, at *50 (Tenn. Crim. App., at Nashville, Sept. 30, 1997), *perm. app. denied* (Tenn. 1998); *see also State v. Jackson*, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993), *perm. to appeal denied* (Tenn. 1994). Of course, the fact that such an extraction constitutes a search is not dispositive, since "the Fourth Amendment does not proscribe all searches and seizures . . . ." *Skinner*, 489 U.S. at 619. "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1 (1968)).

Tennessee's challenged DNA statute, codified in Tennessee Code Annotated section 40-35-321, requires a person convicted of a felony to provide a biological specimen for the purpose of DNA analysis. According to the statute, "DNA analysis" means the process through which deoxyribonucleic acid (DNA) in a human biological specimen is analyzed and compared with DNA from another biological specimen for identification purposes. *Tenn. Code Ann.* § 40-35-321(a). For those that are convicted of offenses that fall within the statute, the court must make the providing of the biological specimen a condition of their probation or community correction if either is granted. *Id.* § 40-35-321(b), (d)(1). Once collected, the specimen is then forwarded to the Tennessee Bureau of Investigation, who must maintain the specimen as provided in section 38-6-113. Tennessee Code Annotated section 38-6-113 provides:

> (c) The bureau shall adopt uniform procedures to maintain, preserve and analyze human biological specimens for DNA. The bureau shall establish a centralized system to cross-reference data obtained from DNA analysis.

> (d) The bureau shall perform DNA analysis and make data obtained available to law enforcement officials in connection with appropriate criminal investigations in which human biological specimens have been recovered. The bureau shall also make the data available to the district attorney general, and the subject of the data in any subsequent criminal prosecution of the subject.

All fifty states have enacted similar DNA database legislation, requiring the collection of blood samples from convicted offenders and storage and analysis of such samples in state DNA databases. In order to comply with the requirements of section 38-6-113(c), Tennessee, (along with forty-nine other states, the U.S. Army, the FBI, and Puerto Rico,) participates in the FBI Laboratory's Combined DNA Indexing System (CODIS). Fed. Bureau of Investigation, CODIS - Participating States, *available at* http://www.fbi.gov/hq/lab/codis/partstates.htm. CODIS enables law enforcement officials to match evidence obtained at the scene of a crime to a particular offender's profile, which can serve as a tool for monitoring the criminal activity of known offenders. *United States v. Kincade*, 379 F.S.W.3d 813, 820 (9th Cir. 2004). As of January, 2005, the CODIS database contained 2,072,513 convicted offender DNA profiles. Fed. Bureau of Investigation, CODIS - Statistical Clickable Map, *available at* http://www.fbi.gov/hq/lab/codis/national.htm. Of those profiles, 54,789 originated in the state of Tennessee. Id.

Although neither our Supreme Court, nor the United States Supreme Court has addressed the issue of whether these DNA statutes constitute an unreasonable search and seizure under the Fourth Amendment, other state and federal courts have upheld DNA statutes similar to Tennessee's, though through divided analytical approaches. A majority of these courts have upheld DNA statutes under a traditional assessment of reasonableness, considering the totality of the circumstances. *See e.g. United States v. Kincade*, 379 F.S.W.3d 813 (9th Cir. 2004); *Groceman v. United States Dep't of Justice*, 354 F.S.W.3d 411, 413-14 (5th Cir. 2004) (per curiam); *Velasquez v. Woods*, 329 F.S.W.3d 420, 421 (5th Cir. 2003) (per curiam); *Jones v. Murray*, 962 F.S.W.2d 302, 306-07 (4th Cir. 1992); *Nicholas v. Goord*, 2004 U.S. Dist. LEXIS 11708, No. 01Civ.7891, 2004 WL 1432533, *2-*6

(S.D.N.Y. June 24, 2004); *United States v. Stegman*, 295 F. Supp. S.W.2d 542, 548-50 (D. Md. 2003); *Padgett v. Ferrero*, 294 F. Supp. S.W.2d 1338, 1343-44 (N.D. Ga. 2003); *United States v. Meier*, No. CR97-72HA, 2002 U.S. Dist. LEXIS 25755 (D. Or. 2002); *United States v. Lujan*, No. CR98-480-02HA, 2002 U.S. Dist. LEXIS 25754 (D. Or. 2002); *Shelton v. Gudmanson*, 934 F. Supp. 1048 (W.D. Wis. 1996); *Kruger v. Erickson*, 875 F. Supp. 583 (D. Minn. 1995); *Vanderlinden v. Kansas*, 874 F. Supp. 1210 (D. Kan. 1995); *Sanders v. Coman*, 864 F. Supp. 496 (E.D.N.C. 1994); *Ryncarz v. Eikenberry*, 824 F. Supp. 1493 (E.D. Wash. 1993); *Polston v.* State, 2005 Ark. LEXIS 36 (Ark. 2005); *Landry v. Attorney General*, 429 Mass. 336, 343-48, 709 N.E.2d 1085 (1999); *Gaines v. State*, 998 P.S.W.2d 166, 171-73 (Nev. 2000); *Johnson v. Commonwealth*, 529 S.E.2d 769, 779 (Va. 2000); *Doles v. State*, 994 P.S.W.2d 315, 317-20 (Wyo. 1999); *In re Maricopa County Juvenile Action*, 930 P.S.W.2d 496, 500-01 (Ariz. Ct. App. 1996); *People v. Adams*, 9 Cal.Rptr. S.W.3d 170, 180-84 (Cal. Ct. App. 2004); *L.S. v. State*, 805 So. S.W.2d 1004, 1006-07 (Fl. Dist. Ct. App. 2001); *People v. Calahan*, 649 N.E.2d 588, 591-92 (Ill. App. Ct. 1995); *Cooper v. Gammon*, 943 S.W.2d 699, 704-05 (Mo. Ct. App. 1997). This balancing test weighs the governmental need for the action against the privacy concern of the individual affected. *People v. Garvin*, 812 N.E.2d 773, 782 (Ill. App. Ct. 2004). In contrast, a minority of courts have determined that the collection of DNA samples from offenders falls within the "special needs" exception to the warrant and probable-cause requirement of the Fourth Amendment. *See Green v. Berge*, 354 F.S.W.3d 675, 679 (7th Cir. 2004); *United States v. Kimler*, 335 F.S.W.3d 1132, 1146 (10th Cir. 2003); *Roe v. Marcotte*, 193 F.S.W.3d 72, 79-82 (S.W.2d Cir. 1999); *Vore v. United States Dep't of Justice*, 281 F. Supp. S.W.2d 1129, 1133-35 (D. Ariz. 2003); *Miller v. U.S. Parole Comm'n*, 259 F. Supp. S.W.2d 1166, 1175-78 (D. Kan. 2003); *United States v. Sczubelek*, 255 F. Supp. S.W.2d 315, 319-23 (D. Del. 2003); *United States v. Reynard*, 220 F. Supp. S.W.2d 1142, 1165-69 (S.D. Cal. 2002); *State v. Martinez*, 276 Kan. 527, 78 P.S.W.3d 769, 771-75 (Kan. 2003); *State v. Olivas*, 856 P.S.W.2d 1076, 1085-86 (Wash. 1993); *State v. Surge*, 94 P.S.W.3d 345, 453 (Wash. Ct. App. 2004); *State v. Steele*, 802 N.E.2d 1127, 1132-37 (Ohio Ct. App. 2003); *In re D.L.C.*, 124 S.W.3d 354, 370-73 (Tex. App. 2003).

We agree with those courts that have adopted the "reasonableness test" when asked to determine whether a DNA statute constitutes an unreasonable search and seizure. Under this test, we must determine whether the State's interest in collecting DNA samples and maintaining a DNA database outweighs the blood test's intrusion on a qualified felon's privacy interest. *See Brown v. Texas*, 443 U.S. 47, 50-51 (1979); *see also State v. Putt*, 955 S.W.2d 640, 645 (Tenn. Ct. Crim. App. 1997). In *State v. Putt*, this Court applied the reasonableness test when analyzing the suspicionless search of a vehicle belonging to a visitor at a correctional facility. 955 S.W.2d at 645. In that case, the defendant entered the grounds of a prison facility in order to visit her husband. Upon arriving at the facility, her car was searched and marijuana and drug paraphernalia were found. The Court held that the government's interest in keeping contraband out of penal institutions outweighed the intrusion into the defendant's privacy caused by the search of her vehicle because the fact that the defendant had entered the grounds of the prison facility diminished her usual expectation of privacy. *Id.* at 646.

Collecting DNA samples from certain convicted offenders and maintaining them in a database pursuant to Tennessee's DNA statute promotes important government interests. First, it is beyond dispute that the State has a strong interest in deterring and prosecuting recidivist criminal acts. *See, e.g., State v. Robinson*, 29 S.W.3d 476, 478 (Tenn. 2000); *see also People v. Garvin*, 812 N.E.2d 773, 782 (Ill. App. 2004). In addition, because it is possible to identify a person "to the practical exclusion of all others" through DNA analysis, the use of the CODIS database as an investigatory tool promotes the State's overwhelming interest in prosecuting crimes *accurately*. *See* Thomas M. Flemming, Annotation, *Admissibility of DNA Identification Evidence*, 84 A.L.R. 4th 313 at § 2[b] (1991).

Because those subject to the DNA statute have already been convicted of a felony and are either incarcerated or on parole or probation, they have a reduced expectation of privacy. Although prisoners do not fall completely outside of the sweep of constitutional protections, "imprisonment carries with it the circumscription or loss of many significant rights." *Hudson v. Palmer*, 468 U.S. 517, 524-25 (1984); *Bell v. Wolfish*, 441 U.S. 520, 545-46 (1979). Prisoners have a diminished expectation of privacy while they are incarcerated. *See Hudson*, 468 U.S. at 526-27 (holding that prisoners have no expectation of privacy in their jail cells); *Bell*, 441 U.S. at 560 (holding that pretrial detainees can be subject to body cavity searches without a warrant or probable cause following contact visits); *see also State v. Dulsworth*, 781 S.W.2d 277, 284 (Tenn. Crim. App. 1989) (noting that a prisoner has no legitimate expectation of privacy in his or her jail cell). Likewise, it is a well-established principle that probationers also have limited privacy rights under the Fourth Amendment. *See Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987). Specifically, courts have held that once a person has been convicted, his or her identity has become a matter of state interest and he or she has lost any legitimate expectation of privacy in the identifying information derived from bodily sampling. *Gaines v. State*, 998 P.S.W.2d 166 (Nev. 2000); *Rise v. Oregon*, 59 F.S.W.3d 1556, 1560 (9th Cir. 1995).

With regard to the intrusive nature of the search, it is widely accepted that the withdrawal of blood is not an "unduly extensive imposition" (*Winston v. Lee*, 470 U.S. 753, 762 (1985)) and "would not be considered offensive by even the most delicate." *Breithaupt v. Abram*, 352 U.S. 432, 436 (1957). The collection of a blood sample is a minimal intrusion and has become routine. *Schmerber v. California*, 384 U.S. 757, 771 (1966). In addition, the DNA profile derived from an offender's blood sample produces only minimally invasive information, as it establishes only a record of the offender's identity.

In light of the substantial interests of the State, the diminished privacy interests of convicted felons, and the minimal intrusion caused by the taking of blood samples, we hold that the collection and maintenance of DNA samples pursuant to Tennessee's DNA statute is reasonable. As such, the trial court properly denied Defendant's motion to suppress. Defendant is not entitled to relief on this issue.

**B. Sufficiency of Evidence**

Defendant contends that the evidence presented at trial was insufficient to support his conviction. When an appellant challenges the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. S.W.2d 560 (1979); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); Tenn. R. App. P. 13(e). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). This court will not reweigh the evidence, reevaluate the evidence, or substitute its evidentiary inferences for those reached by the jury. *State v. Carey*, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995). Furthermore, in a criminal trial, great weight is given to the result reached by the jury. *State v. Johnson*, 910 S.W.2d 897, 899 (Tenn. Crim. App. 1995).

Defendant does not dispute that the evidence presented at trial established that the victim was, in fact, the victim of a rape and aggravated burglary. However, he argues that the evidence was insufficient to identify him as the assailant. At trial, the victim identified the Defendant as her attacker after describing the sex, race, complexion, weight, clothing, height, build and age of the person who attacked her. One of the officers who investigated the burglary and rape testified that the victim gave him a description of the assailant's sex, race, height, weight, and age on the morning of the attack. The DNA profile from the victim's rape kit matched Defendant's DNA profile. The DNA analysis expert who testified at trial stated that "the probability of an unrelated individual having the same DNA profile from either the African-American, Caucasian, Southeastern Hispanic, or Southwestern Hispanic population exceeds the current world population." In other words, the expert witness concluded that no other person could have been the source of the semen left inside the victim. This evidence presented at trial was sufficient to support the jury's finding beyond a reasonable doubt that Defendant was the person who committed these crimes. Defendant is not entitled to relief on this issue.

**C. Validity of Defendant's Sentence**

Defendant argues that the length of his sentence for the rape conviction should be reduced in light of *Blakely v. Washington*, 542 U.S. ___, 159 L. Ed. S.W.2d 403, 124 S.Ct. 2531 (2004).

A defendant who challenges his or her sentence has the burden of proving the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). It is this court's duty to conduct a *de novo* review of the record with a presumption the trial court's determinations are correct when a defendant appeals the length, range, or manner of service of his or her sentence. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999).

Following a sentencing hearing, Defendant was sentenced to concurrent sentences of fifteen years for aggravated burglary as a career offender and sixteen years for rape as a Range II offender. Defendant's fifteen-year sentence for aggravated burglary is the sentence mandated by statute for a career offender who commits a class C felony. Tenn. Code Ann. § 40-35-108(c), -112(c)(3). According to statute, the presumptive sentence for Defendant's rape conviction is twelve years, but may be enhanced up to a maximum sentence of twenty years. *Id.* § 40-35-112(b)(2). After considering the evidence introduced at the sentencing hearing, the trial court held that the two enhancement factors applied to Defendant: the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; and the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community. *See id.* § 40-35-114(2), (9). In addition, the court held that one mitigating factor was applicable because Defendant's criminal conduct did not cause or threaten serious bodily injury. *Id.* § 40-25-113(1). After weighing these two enhancement factors and one mitigating factor, the trial court sentenced Defendant to serve sixteen years for his rape conviction, four years above the presumptive sentence of twelve years.

Defendant did not initially raise any issues in his motion for new trial concerning the length of his sentence. However, on appeal, Defendant asks this court to consider the impact of the ruling in *Blakely v. Washington*, 542 U.S. ___, 159 L. Ed. S.W.2d 403, 124 S.Ct. 2531 (2004), on the trial court's sentencing determinations. The State argues that Defendant has waived any sentencing issues under *Blakely* by the failure to raise his issues in the trial court under Rule 36(a) of the Tennessee Rules of Appellate Procedure. Indeed, according to the Tennessee Supreme Court's recent decision, *State v. Gomez*, both the United States Supreme Court and the Tennessee Supreme Court do not regard *Blakely* as having announced a new rule of law. *State v. Edwin Gomez and Jonathan S. Londono*, ___ S.W.3d ___, No. M2002-01209-SC-R11-CD, 2005 Tenn. LEXIS 350 (Tenn., at Knoxville, April 15, 2005). As such, Defendant did not properly preserve a Sixth Amendment challenge to his sentence, and Defendant is limited to seeking relief on his Sixth Amendment claim via plain error review. *See Gomez*, 2005 Tenn. LEXIS 350. In *Gomez*, our Supreme Court concluded that Tennessee's sentencing structure does not violate the Sixth Amendment and that *Blakely* therefore does not apply to Tennessee's sentencing scheme. *Id.* Because Defendant's sentences were not imposed in violation of the Sixth Amendment, Defendant is not entitled to relief because the record reflects no error.

The trial court properly gave great weight to Defendant's previous history of criminal convictions, and properly considered the enhancement factor that Defendant has a previous history of unwillingness to comply with the conditions of his release. The trial court appropriately excercised judicial discretion in imposing Defendant's sentence after carefully considering these enhancement factors and one mitigating factor. The evidence does not preponderate against the trial court's decision.

## CONCLUSION

For the foregoing reasons, we affirm Defendant's convictions and sentences for aggravated burglary and rape.

_____

THOMAS T. WOODALL, JUDGE